**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

ALI AL-MAQABLH,

        Plaintiff,                            Case No. 1:11-cv-531

     vs.                                   BECKWITH, J.
                                          BOWMAN, M.J.
UNIVERSITY OF CINCINNATI
COLLEGE OF MEDICINE, et al.,

        Defendants.

**REPORT AND RECOMMENDATION**

Plaintiff Ali Al-Maqablh, proceeding *pro se*, brings this action against the University of Cincinnati College of Medicine ("the University"), alleging violations of employment discrimination via 42 U.S.C. § 2000e-2(a)(1) ("Title VII"), 29 U.S.C. § 794 ("Rehabilitation Act"). Plaintiff's complaint arises from his termination from the University's graduate program on June 19, 2009. This matter is now before the undersigned on the University's motion for summary judgment, including proposed undisputed facts and the parties' responsive memoranda. (Docs. 65, 75, 78).[1] For the reasons set forth herein, I now recommend that the University's motion for summary judgment be **GRANTED**.

### I.    Facts and Procedural History

The University is a state university created by the Ohio General Assembly. (Ohio Rev. Code § 3361.06).

---

[1] The University's motion is also supported by the depositions of Plaintiff, Peter Stambrook, Maria Csyzyk-Krezeska, Jerry Lingrel, Robert Zierof, Robert Brackenbury, Susan Waltz, Chunying Du and Wallace Ip.

Plaintiff's country of origin is Jordan and his race is Arab.  (Doc. 64, p. 13).  After receiving his Masters of Science degree from Chicago State University in 2007, Plaintiff applied to the University's Graduate Program in Cancer and Cell Biology (the "Program").  *Id.* at 17, 19.

During the time Plaintiff applied for admission into the Program, Robert Brackenbury was the Director of the Program and Peter Stambrook was the Chair of the Department of Cancer and Cell Biology.  (Doc. 64, Ex. 5, p. vi; Stambrook Dep. p. 10).

On April 11, 2008, Plaintiff received a letter informing him that he had been accepted into the Program. (Doc. 64, Ex. 3).  The acceptance letter set forth some basic information and guidelines about the Program, including a reference to students completing rotations in laboratories during their first year in order to help them choose a thesis advisor.  *Id.*  The letter also encouraged Plaintiff to enroll for the summer quarter, which began July 1, 2008.  *Id.*  On July 1, 2008, Plaintiff began his studies in the Program.  (Doc. 64, Ex. 3; Brackenbury Dep. p. 19).

In conjunction with his studies, Plaintiff received a University Graduate Assistant Scholarship.  (Doc. 64, Ex. 2; Plaintiffs Ex. 3; Brackenbury Dep. p. 16).  When notified of his receipt of this scholarship, Plaintiff was also notified that this award was contingent upon his remaining a student in good standing in the Program.  *Id.*

In August 2008, shortly after Plaintiffs acceptance into the Department of Cancer and Cell Biology, that Department merged with the Department of Molecular Oncology. (Stambrook Dep. p. 34; Czyzyk-Krzeska Dep. p. 45).  After the merger, Jorge Moscat, who was chair of the Department of Molecular Oncology, replaced Stambrook as the

chair of the newly constituted Department of Cancer and Cell Biology. (Stambrook Dep. p. 10; Czyzyk-Krzeska Dep. p. 46).

Shortly before the merger, on July 21, 2008, Brackenbury sent out an email announcing that he had resigned from his position as Director of the Program. (Brackenbury Dep. p. 19, 22; Doc. 74, Pl's Ex. 4). After Brackenbury's resignation, Moscat appointed Susan Waltz and Maria Czyzyk-Krzeska as co-directors of the Program . (Waltz Dep. p. 37; Czyzyk-Krzeska Dep. p. 50).

Incoming Program students are informed of various Program requirements through the Program's Student Handbook (the "Handbook"), as well as through other avenues. (Doc. 64, p. 28-29; Ex. 5). Among other things, the Handbook informs the Program's students that failure to remain compliant with these academic requirements could be grounds for dismissal from the Program. (Doc. 64, Ex. 5, p. 24-25).

One of the academic requirements placed upon Program students is the requirement that they pass five required classes - Biochemistry, Molecular Genetics, Cell Biology, Biology of Cancer and Action of Cancer Therapeutics - with a grade of "B" or better. (Doc. 64, Ex. 5, p. 8, 24). A Program student's failure to meet this requirement is grounds for dismissal from the Program. *Id.*, p. 24.

During the autumn quarter of 2008, Plaintiff received an "I" or incomplete in his Biochemistry course. (Doc. 64, p. 48-49). During the winter quarter of 2009, Plaintiff received a "C" in Cell Biology. *Id.*, p. 53-54.

Another academic requirement for the Program's students is that they select a thesis advisor by the end of their first year in the Program. (Doc. 64, Ex. 5, p. 5, 8, 24; Brackenbury Dep., p. 21). A Program student's thesis advisor bears the total financial

responsibility for each student in the advisor's laboratory, which includes the student's scholarship award, stipend, tuition, health insurance and possible fringe benefits. (Brackenbury Dep. p. 21; Stambrook Dep. p. 59; Waltz Dep. p. 61; Czyzyk-Krezska Dep. p. 94, 106, 109). While the Graduate Program itself provides the stipend and tuition support to students during their first year in the Program, the student's advisor is financially responsible for such costs, as well as the student's research activities, after the student's first year until the student finishes or leaves the Program. *Id.*

On or about March 2, 2009, after completing only two of the recommended three clinical rotations during his first year, Plaintiff selected Dr. Ray Boissy as his thesis advisor and joined Dr. Boissy's lab. (Doc. 74, Exs. 30, 32; Waltz Dep. p. 92-96; Czyzyk-Krzeska Dep. p. 82).

In late March 2009, Dr. Boissy gave Plaintiff a review and grade that Plaintiff disagreed with. (Doc. 64, Ex. 10). On March 23, 2009, in an email to Dr. Boissy, Plaintiff acknowledged that poor grades were grounds for dismissal from the Program. *Id.* Plaintiffs email states that a grade of B in Dr. Boissy's lab could "place [him] at the bottom of the ques [sic] and probably get [him] kicked out of the program. *Id.* Thereafter, Plaintiff determined that Dr. Boissy's lab was not an appropriate fit for him. (Doc. 64, p. 68-70; Doc. 74, Ex. 54). Dr. Boissy agreed, and on April 29, 2009, he retracted his commitment to advise and provide financial support for Plaintiff. *Id.*

On or about April 15, 2009, the Program's Graduate Committee reviewed Plaintiff's performance in the Biochemistry and Cell Biology courses and, based upon this review, placed Plaintiff on academic probation. (Doc. 64, Ex. 5, Ex. 15). In the letter he received from the Graduate Committee notifying him of this decision, Plaintiff

was informed that "should he succeed in bringing grades and performance in alignment with program requirements, [his] probation may be reviewed and returned to good standing." *Id.*

On or about June 15, 2009, Plaintiff attended a meeting with the Graduate Committee designed, in part, to determine Plaintiffs progress in obtaining an advisor. (Doc. 64, p. 87, 90).  During this meeting, Plaintiff informed those attending the meeting that he had not yet obtained an advisor willing to take full financial responsibility for him. *Id.* p. 88-89.  Upon receiving this information, the Graduate Committee again assessed Plaintiff's standing in the Program.  (Doc. 64. Ex. 17; Waltz Dep. p. 112-113).  The Graduate Committee discussed Plaintiffs failure to find an advisor as well as  the fact that Plaintiff was currently on academic probation for having received a grade below a "B" in Cell Biology.  (Doc. 64, Ex. 17).

The Program Handbook provides that "any student who is placed on academic probation two times will be dismissed from the doctoral program unless there are extenuating circumstances as determined by the Graduate Committee." (Doc. 64, Ex. 5, p. 25).  After weighing all the evidence before it - including the fact that Plaintiffs failure to find an advisor would have placed him in an academic probation status in successive quarters - the Graduate Committee decided to dismiss Plaintiff from the Program.  (Doc. 64, Ex. 17).

Plaintiffs dismissal from the Program was effective June 30, 2009. (Doc. 64, Ex.17).  Following his dismissal from the Program, Plaintiff availed himself of the Program's and the University's grievance processes. (Doc. 64, Exs. 20, 21, 22, 23; Lingrel Dep.; Zierolf Dep.).  These processes included independent reviews of Plaintiff's

dismissal by sources outside the Program, including reviews by a grievance committee, the Dean of the College of Medicine, and the University's Vice Provost/Dean of the Graduate School. *Id.* At each level, the Program's decision was upheld. *Id.*

Thereafter, on April 14, 2010, Plaintiff submitted a charge of discrimination on the basis of race and national origin to the Equal Employment Opportunity Commission ("EEOC"). (Doc. 3). Plaintiff's charge asserted that: (1) he was a natural born citizen of Jordan; (2) he was employed as a Graduate Research Assistant in the Department of Cancer and Cell Biology at the University of Cincinnati College of Medicine ("the University"); (3) he was discharged from the graduate program on June 19, 2009, for alleged poor academic performance and inability to obtain a faculty advisor; and (4) "similarly situated non-minority Graduate Research Assistants who had no greater academic performance and who also were delayed in obtaining faculty advisors were permitted to continue the program." (Doc. 3). On May 11, 2011, the EEOC closed its file on Plaintiff's charge and issued a "Dismissal and Notice of Rights" letter, noting that it was "unable to conclude that the information obtained establishes violations of the statutes." (Doc. 3).

Plaintiff filed the instant action in August 2011 against Defendants seeking redress for "discrimination," "conspiracy," and "neglecting disability." The complaint alleges that he was (1) placed on academic probation, (2) dismissed from the University's graduate program, and (3) terminated from his graduate research assistant position based on "rules that don't exist." (Doc. 3 at 2).

The University then moved for judgment on the pleadings asserting, *inter alia*, that Plaintiff's ADA, § 1983 and Rehabilitation Act claims as well as any state law claims

should be dismissed.  The University further contended that Plaintiff's Title VII claim should be dismissed because Plaintiff was not an employee for the purposes of Title VII. The University's motion for judgment on the pleadings was granted in part and denied in part and Plaintiff's claims were all dismissed, with the exception of the Title VII claim against the University.   Notably, Plaintiff was granted leave to file an amended complaint relating only to his Title VII claims.

On September 27, 2012, Plaintiff filed his Amended Complaint (Doc. 35) alleging that defendant University of Cincinnati College of Medicine ("University") dismissed him from the Graduate Program in Cancer and Cell Biology because of his national origin and/or race in violation of 42 U.S.C. § 2000e et seq.,Title VII, Civil Rights Act of 1964. The University now moves for summary judgment on Plaintiff's remaining Title VII claim.

## II. Standard of Review

In a motion for summary judgment, "a court must view the facts and any inferences that can be drawn from those facts ... in the light most favorable to the nonmoving party."  *Keweenaw Bay Indian Comm. v. Rising,* 477 F.3d 881, 886 (6th Cir. 2007) (internal quotation marks omitted).  "Summary judgment is only appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(c)) (internal quotation marks omitted).  "Weighing of the evidence or making credibility determinations are prohibited at summary judgment-rather, all facts must be viewed in the light most favorable to the non-moving party." *Id.*

The requirement that facts be construed in the light most favorable to the Plaintiff, however, does not mean that the court must find a factual dispute where record evidence contradicts Plaintiff's wholly unsupported allegations. After a moving party has carried its initial burden of showing that no genuine issues of material fact remain in dispute, the burden shifts to the non-moving party to present specific facts demonstrating a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). "The 'mere possibility' of a factual dispute is not enough." *Mitchell v. Toledo Hosp.,* 964 F.2d 577, 582 (6th Cir.1992) (citing *Gregg v. Allen-Bradley Co.,* 801 F.2d 859, 863 (6th Cir.1986)). In order to defeat the motion for summary judgment, the non-moving party must present probative evidence that supports its complaint. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249-50 (1986). The non-moving party's evidence "is to be believed, and all *justifiable* inferences are to be drawn in his favor." *Id.* at 255 (emphasis added). The court determines whether the evidence requires submission to a jury or whether one party must prevail as a matter of law because the issue is so one-sided. *Id.* at 251-52.

To demonstrate a genuine issue of fact, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts .... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita,* 475 U.S. at 587 (citation omitted). It is the Plaintiff's burden to point out record evidence to support his claims. "[T]he Court has no duty when deciding a motion for summary judgment to scour the record for evidence that supports a plaintiff's claims." *Abdulsalaam v. Franklin*

*County Bd. Of Com'rs*, 637 F. Supp.2d 561, 576 (S.D. Ohio 2009) (citing *Williamson v. Aetna Life Ins. Co.,* 481 F.3d 369, 379 (6th Cir. 2007)).

### B.  Defendant's Motion for Summary Judgment

As detailed above, Plaintiff's complaint alleges that the University discriminated against him due to his race and national origin in violation of Federal law.  The University now moves for summary judgment.  The University argues that Plaintiff, as a graduate student, is not an employee for purposes of Title VII.  Assuming arguendo, that Plaintiff is a covered employee under Title VII, the University further asserts that Plaintiff has failed to exhaust his administrative remedies and cannot establish a *prima facie* case of race or national origin discrimination.  The University also asserts that it had a legitimate non-discriminatory reason for dismissing Plaintiff from the Program and Plaintiff cannot show that the University's proffered reason for his termination is a pretext for discrimination.  Plaintiff, however, claims that he is able to establish a *prima facie* case of discrimination because he was treated less favorably than similarly-situated Caucasian students.  He further argues that he can establish a genuine issue of material fact as to whether the University's articulated reason for his termination is a pretext for discrimination.

### C. Defendant is entitled to Judgment as a Matter of law

a.  *Applicable Law*

Title VII makes it unlawful for an employer to discharge an individual or to otherwise discriminate against an individual with respect to compensation, terms, conditions, or privileges of employment because of such individual's race or national origin.  42 U.S.C. § 2000e-2(a)(1).

An employee may base his claim of employment discrimination on a theory of disparate impact or disparate treatment or both.  *Lynch v. Freeman*, 817 F.2d 380, 382 (6th Cir. 1987).  In the instant case, Plaintiff proceeds under the disparate treatment theory of discrimination.  Under the disparate treatment theory, the plaintiff must show that the employer has treated some people less favorably than others because of their race, color, religion, sex or national origin.  Unlike the disparate impact theory, proof of discriminatory motive is critical in the case of disparate treatment. *Rowe v. Cleveland Pneumatic Co., Numerical Control, Inc.*, 690 F.2d 88, 92 (6th Cir. 1982) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).  Claims of disparate treatment are analyzed under the burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Policastro v. Northwest Airlines, Inc.*, 297 F.3d 535, 538 (6th Cir. 2002); *Mitchell*, 964 F.2d at 582.  The *McDonnell Douglas* burden-shifting analysis requires that plaintiff first establish a *prima facie* case of discrimination. *Id.*

A plaintiff may establish a *prima facie* discrimination claim by either direct or circumstantial evidence. *Younis v. Pinnacle Airlines, Inc.*, 610 F.3d 359, 363 (6th Cir. 2010).  "Direct evidence of discrimination is 'that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions.'" *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003) (en banc).  "Circumstantial evidence, on the other hand, is proof that does not on its face establish discriminatory animus, but does allow a factfinder to draw a reasonable inference that discrimination occurred." *Id.*

A plaintiff who lacks direct evidence of discrimination may establish a *prima facie*

-10-

case of discrimination through circumstantial evidence by showing that: 1) he is a member of a protected class; 2) he suffered an adverse employment action; 3) he was qualified for the position lost; and 4) he was replaced by an individual outside the protected class.  *Mitchell,* 964 F.2d at 582.  Plaintiff may also establish the fourth prong of a *prima facie* case of discrimination by showing that he was treated less favorably than a similarly-situated individual outside the protected class.  *See Clayton v. Meijer, Inc.,* 281 F.3d 605, 610 (6th Cir. 2002).

If the plaintiff seeks to establish that he was treated less favorably than a similarly-situated individual, he must prove that all relevant aspects of his employment situation were similar to those of the employee with whom he seeks to compare himself. *Ercegovich v. Goodyear Tire & Rubber Co.,* 154 F.3d 344, 352 (6th Cir. 1998).  To be similarly-situated in a disciplinary context, the individuals must have dealt with the same supervisor, they must have been subject to the same standards, and they must have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for that conduct. *Id.* (quoting *Mitchell,* 964 F.2d at 583); *Smith v. Leggett Wire Co.,* 220 F.3d 752, 762 (6th Cir. 2000).  The determination of whether the plaintiff and another employee shared the same supervisor must be made "on a case-by-case basis and does not depend entirely on whether the two shared the same immediate supervisor." *Barry v. Noble Metal Processing, Inc.*, 276 Fed. Appx. 477, 481 (6th Cir. 2008) (citing *McMillan v. Castro*, 405 F.3d 405, 414 (6th Cir. 2005)).  "[I]n many instances, the term 'supervisor' should be construed broadly to include cases where both employees' situations were handled by the same 'ultimate decision-maker.'" *Id.* (citing *McMillan*, 405

F.3d at 414).  Accordingly, a plaintiff and a comparable employee who are directly supervised by different individuals may still be similarly situated if the same member of management disciplined both of them.  *Id.* (citing *McMillan*, 405 F.3d 405; *Seay v. Tenn. Valley Auth.*, 339 F.3d 454, 459 (6th Cir. 2003)).

"[T]he weight to be given to each factor can vary depending upon the particular case."  *Johnson v. Kroger Co.*, 319 F.3d 858, 867 (6th Cir. 2003).  The ultimate question is whether employees involved in acts of "comparable seriousness" were nonetheless retained.  *Clayton*, 281 F.3d at 611 (citing *McDonald v. Santa Fe Transp. Co.,* 427 U.S. 273, 283 n.11 (1976)).

The employer is entitled to summary judgment if the plaintiff does not establish a *prima facie* case.  If the plaintiff establishes a *prima facie* case, the employer can overcome the *prima facie* case by articulating a legitimate, nondiscriminatory reason for the adverse employment action.  *McDonnell Douglas,* 411 U.S. at 802.  If the employer carries its burden, the plaintiff must show that the reasons offered by the employer were not its true reasons, but were a pretext for discrimination.  *Id.* at 804.

The Sixth Circuit has categorized different evidentiary bases for three types of pretext showings: 1) defendant's reasons had no basis in fact; 2) the reasons did not actually motivate the employer's decision; or 3) the reasons were insufficient to warrant the decision.  *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994), *overruled on other grounds by Gross v. FBL Financial Services,* 129 S.Ct. 2343 (2009).  The first type of showing consists of evidence that the reason offered for the plaintiff's discharge never happened, *i.e.*, the reason is factually false.  *Id.*  The third showing ordinarily consists of evidence that other employees, particularly those outside

the protected class, were not discharged even though they engaged in conduct substantially identical to that which purportedly motivated the plaintiff's discharge.  *Id.*  If the plaintiff establishes the first or third showing, a permissive inference of discrimination arises.  *Id.*  For the second showing, where the plaintiff admits the factual basis underlying the employer's proffered explanation and further admits that such conduct could motivate dismissal, the plaintiff must introduce additional evidence of discrimination because the reasons offered by the defendant are not directly challenged and therefore do not bring about an inference of discrimination.  *Id.*

The Sixth Circuit has cautioned that *Manzer's* three-part test is not to be applied in a formalistic manner.  *See Chen v. Dow Chemical Co.*, 580 F.3d 394, 400 n.4 (6th Cir. 2009).  Rather, the court must bear in mind that "[p]retext is a commonsense inquiry: did the employer fire the employee for the stated reason or not?"  *Id.*  The court must ask whether the plaintiff has produced evidence that casts doubt on the employer's explanation and, if so, how strong the evidence is.  *Id.*  The 6th Circuit in *Chen* explained,

> At the summary judgment stage, the issue is whether the plaintiff has produced evidence from which a jury could reasonably doubt the employer's explanation. If so, her prima facie case is sufficient to support an inference of discrimination at trial.  *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 515 (1993).  But summary judgment is proper if, based on the evidence presented, a jury could not reasonably doubt the employer's explanation.  *See Reeves v. Sanderson Plumbing Prod., Inc.,* 530 U.S. 133, 148 (2000).  ("[A]n employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred.").

*Id.*

A plaintiff must allege more than a dispute over the facts upon which her

discharge was based in order to establish pretext. *Braithwaite v. Timken Co.*, 258 F.3d 488, 493-494 (6th Cir. 2001). He must put forth evidence that demonstrates the employer did not "honestly believe" in the proffered nondiscriminatory reason for its adverse employment action. *Id.* (citing *Smith v. Chrysler Corp.*, 155 F.3d 799, 806-07 (6th Cir. 1998)).  An employer has an honest belief in its nondiscriminatory reason for discharging the employee "where the employer reasonably relied 'on the particularized facts that were before it at the time the decision was made.'"  *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001) (citing *Chrysler Corp.*, 155 F.3d at 807).    In determining whether an employer "reasonably relied on the particularized facts then before it," it is not necessary that "the decisional process used by the employer be optimal or that it left no stone unturned."  *Braithwaite*, 258 F.3d at 493 (quoting *Chrysler Corp.,* 155 F.3d at 807).  "Rather, the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action."  *Id.* (citing *Chrysler Corp.*, 155 F.3d at 807).  As long as an employer has an honest belief in its proffered nondiscriminatory reason for discharging an employee, the employee cannot establish that the reason was pretextual simply because it is ultimately shown to be incorrect.  *Majewski*, 274 F.3d at 1117 (citing *Chrysler Corp.*, 155 F.3d at 806).

Summary judgment in favor of a defendant is appropriate where the plaintiff fails to establish a *prima facie* case or is unable to demonstrate pretext sufficient to rebut the defendant's legitimate, non-discriminatory reasons. *Barnhart v. Peckrel, Schaeffer & Ebeling Co.,* 12 F.3d 1382, 1395 (6th Cir. 1993). "The ultimate burden of persuasion remains with the plaintiff to prove that the employer's reasons were a pretext for

discrimination *and* that the employer intended to discriminate on the basis of race."
*Thurman*, 90 F.3d at 1166 (emphasis in the original) (citing *Hicks*, 509 U.S. at 502).

The finder of fact may infer discrimination from the elements of a prima facie case,

coupled with its disbelief of the rationale articulated by the employer.  *See Hicks,* 509

U.S. at 511 ("The factfinder's disbelief of the reasons put forward by the defendant

(particularly if disbelief is accompanied by a suspicion of mendacity) may, together with

the elements of the prima facie case, suffice to show intentional discrimination.  Thus,

rejection of the defendant's proffered reasons, will permit the trier of fact to infer the

ultimate fact of intentional discrimination . . . 'no additional proof of discrimination is

required. . . .').  *See also Barnett v. Department of Veterans Affairs*, 153 F.3d 338, 341

(6th Cir. 1998); *E.E.O.C. v. Yenkin-Majestic Paint Corp.,* 112 F.3d 831, 835 (6th Cir.

1997); *Thurman,* 90 F.3d at 1166-67.

### b.  Plaintiff's status as an Employee

The University first contends that Plaintiff's Title VII claim should be dismissed

because as a graduate student, Plaintiff is not an employee protected by the statue.

As noted by the University, "[t]he Sixth Circuit has not addressed whether a

graduate assistant is an 'employee' for purposes of Title VII." *Ivan v. Kent State*

*University*, 863 F.Supp. 581, 585 (N.D. Ohio 1994).  In *Ivan*, however, the Court

determined that the "totality of the circumstances" of Ivan's graduate assistantship

demonstrates she was an employee under the terms of Title VII.  *Id.* at 586.  In so

concluding, the Court evaluated the "economic realities" of the relationship between

Ivan and Kent State University.  Notably, to determine if an individual should be

considered an employee under Title VII, a Court must look to the economic realities of

relationships between individuals and employers.  An examination of economic realities of employment relationships is useful because economic dependence increases an employees' susceptibility to discriminatory practices under Title VII.  *Kirby v. Robby Len Swimfashions*, No. 89–6038, 1990 WL 72322, at *1–2 (6th Cir. June 1, 1990). The "economic realities test" allows a case-by-case determination of employment status based on the totality of the circumstances of employment.  *Lilley v. BTM Corp.*, 958 F.2d 746, 750 (6th Cir.), cert. denied, 506 U.S. 940, 113 S.Ct. 376, 121 L.Ed.2d 287 (1992).

    In *Ivan*, applying the economic realities test, the court pointed to three contracts provided for Ivan's employment in which she agreed to "render service" to Kent State. *Id*. at 585.  In addition, Kent State withheld retirement contributions from Ivan's graduate assistantship stipend, which the court considered pay.  *Id*.  Kent State also agreed to pay Ivan's compensation in compliance with state and federal law.

    No such contracts exist in this case.  The University asserts that Plaintiff was a student, not a University employee and did not render services to the University.  As such, Plaintiff participated in the Graduate Program as a student engaging in "courses, seminars and laboratory research during the academic year."  (Doc. 64, Ex. 3).  The University further notes that Plaintiff was not required to serve as a teaching or lab assistant.  Pursuant to the Program Handbook, "all students in good academic standing in the Cancer and Cell Biology Graduate Program receive tuition scholarships ...or graduate assistantship stipends" in the amount of $22,000 and an award that covers individual health insurance.  (Doc. 64, Ex. 5, p. 2).  As such, the University contends

that Plaintiff received a scholarship, that all Program students received and was not an employee of the University.

More importantly, the dominant purpose of Plaintiff's relationship with the University was educational.  Plaintiff's complaint against the University asserts claims solely related to his academic activities as a graduate student.  *See Bakhtiari v. Lutz*, 507 F.3d 1132, 1137–1138 (8th Cir. 2007) (holding former graduate student and teaching assistant could not proceed under Title VII because he made complaints about the university as a university, not as his employer); *Seaton v. University of Pennsylvania,* 2001 WL 1526282 *8 (E.D.Pa. Nov.30, 2001) (holding graduate student could not proceed under Title VII because complaint did not suggest student was retaliated against as employee, but as student); *Bucklen v. Rensselaer Polytechnic Institute*, 166 F.Supp.2d 721, 725–726 (N.D.N.Y.2001) (same); *Stilley v. University of Pittsburgh*, 968 F.Supp. 252, 261 (W.D.Pa.1996) (holding all issues pertaining to completion of plaintiff's dissertation related to plaintiff's role as a student and not as employee).

Plaintiff however, asserts that he received a paycheck from the University and rendered services to the University by performing extensive research through lab work. Notably, Plaintiff has submitted a "pay stub", from the University, showing that he contributed to the retirement system and taxes were withheld.  However, as noted above, Plaintiff received a stipend and/or scholarship after being accepted into the Program.  Plaintiff has failed to show that this pay stub was based upon is employment with the University and not a portion of his stipend award.  Furthermore, the fact that Plaintiff performed extensive research, as required under the Program, does not make

him an employee under Title VII.  See *Pollack v. Rice Univ.,* 1982 U.S. Dist. LEXIS 12633 (S.D. Tex. 1982) (finding that paid research and instruction by the plaintiff was "attendant to his capacity as a graduate student" because it was a central part of the graduate program and, therefore, the plaintiff's status was that of "student" rather than "employee").

Here, the undisputed evidence establishes that the University's decision to dismiss Plaintiff from the Graduate Program was an academic decision unrelated to Plaintiff's alleged employment with the University.  As such, the undersigned finds that Plaintiff should not be considered an employee under Title VII and therefore, his claims under Title VII against the University should fail as a matter of law.

In any event, as explained below, even assuming that Plaintiff could be considered an employee under Title VII, Plaintiff has failed to establish unlawful discrimination on the part of the University.

c. *Direct Evidence of Discrimination*

"Direct evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions. *Jacklyn v. Sehering-Plough Healtheare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999).  Direct evidence "does not require a fact finder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected group."  *Johnson v. Kroger Co.*, 319 F.3d 858, 865 (6th Cir. 2003).  "[S]tray remarks, remarks by nondecision makers, comments that are vague, ambiguous, or isolated, and comments that are not proximate in time to the act of termination" do not constitute direct evidence.  *Johnson v. Kroger Co.*, 160 F.

-18-

Supp.2d 846, 853 (S.D. Ohio 2001), rev'd on other grounds, 319 F.3d 858 (6th Cir. 2003).  *See also, Wilson v. Ohio Dep't job & Family Servs.*, 178 Fed. Appx. 457,464 (6th Cir. Apr. 25, 2006).

Plaintiff's memorandum *contra* to the University's motion for summary judgment cites to several actions and/or statements he believes constitute direct evidence of discrimination.  Such actions include:

> Program administrators discriminatorily painted him as a violent person and a psychological threat.  Plaintiff also cites to an email from Sharon Young wherein she states "[i]f we are concerned that Ali could act out physically, Dr. Zierolf recommended we meet with Dan Cummins, Director of Student Life—University Judicial Affairs.".  (Doc. 76, Ex. 21).

> Department Chairman Jorge Moscat asked Plaintiff not to be present within sight, invaded Plaintiff's personal space, and discarded Plaintiff's belongings.  A November 13, 2008 email from Jorge Moscat, contains an apology from Plaintiff for studying by the printer near Moscat's office. (Doc. 64, Ex. 8).  In response, Moscat indicates that the location is not the best place to study and the facilities are for students, postdocs, and faculty with labs in his department.

> David Plas, a course director and committee member "told the program that Plaintiff contested his grade and urged them not to hire personnel like Plaintiff."  (Doc. 75, p. 42).

> Professor and former Co-director of the Graduate Program Maria Czyzyk-Krzeska never called him by name, but instead, she would say "you people, you know, something like this - you guys, you know, or something like that." (Doc. 64, at 155).  According to Plaintiff, if Plaintiff walked into Czyzyk-Krzeska's office, she would say "you people always contest your grades" or "[y]ou people always, you know, come at the wrong time."  *Id.*

> Maria Diaz-Meco, assistant to the Chairman, intimidated a junior faculty member to prevent the faculty member from accepting Plaintiff in her lab and that this was in order to "execute the plan devised" in the Sharon Young email. (Doc. 75, p. 43).

> Program Administrator Susan Waltz informed Plaintiff that even if he received an "acceptable grade" he would still be put on probation.  (Doc. 75, p. 43).

None of Plaintiff's examples, however, establish direct evidence of discrimination *motivated* by his race or national origin.  As noted by the University, Plaintiff's alleged direct evidence requires the Court to draw inferences in order to conclude that the University's actions were motivated by Plaintiff's race or national origin.  Direct evidence, by definition, "does not require a fact finder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected group."  *Johnson v. Kroger Co.*, 319 F.3d 858, 865 (6th Cir. 2003).  In addition, many of the actions or statements Plaintiff points to constitute stray remarks, remarks by non-decision makers, comments that are vague, ambiguous, or isolated, and comments that are not proximate in time to his dismissal from the Graduate Program.  *See Johnson v. Kroger Co.,* 160 F. Supp.2d 846, 853 (S.D. Ohio 2001), rev'd on other grounds, 319 F.3d 858 (6th Cir. 2003).

In light of the foregoing, the undersigned finds that Plaintiff has not come forth with evidence establishing direct evidence of discrimination.  As such, the Court will now determine whether Plaintiff can establish a *prima facie* case of discrimination based upon the presentation of circumstantial evidence.

    d.  *Prima Facie Case of Discrimination*

The University further argues that it is entitled to judgment as a matter of law because Plaintiff cannot establish the fourth prong of a *prima facie* case of race discrimination.[2]  Notably, the last element in the *prima facie* analysis requires the

---

[2]  With respect to the second prong of a *prima facie* case, the existence of an adverse action, the University notes that the only adverse action Plaintiff raises in his EEOC charge is his dismissal from the Program.  Plaintiff's Amended complaint, however, appears to asserts that he suffered an adverse action by being placed on academic probation.  Plaintiff's amended complaint also appears to assert claims for a hostile work environment.  Plaintiff's failure to include such claims in his EEOC charge bars judicial relief.  Notably, a prerequisite to bringing

plaintiff to show that he was treated less favorably than similarly-situated individuals outside the protected class.  To be treated as similarly-situated, an employee must "have dealt with the same supervisor [as the plaintiff], have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Mitchell,* 964 F.2d at 583.  Differences in job title, responsibilities, experience, and work record can be used to determine whether two employees are similarly situated. *Pierce v. Commonwealth Life Ins.*, 40 F.3d 796, 801, 802 (6th Cir. 1994).

The plaintiff need not demonstrate similarity in all respects; and the Court should evaluate the factors discussed in *Mitchell*, *supra* at p. 10, to the extent they are relevant to the particular circumstances of the case.  *See Jackson v. FedEx Corp. Servs., Inc.*, 518 F.3d 388, 394 (6th Cir. 2008) (citing *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998)).  Thus, Courts "should make an independent determination as to the relevancy of a particular aspect of the plaintiff's employment status and that of the non-protected employee." *Id.* (quoting *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 802 (6th Cir.1994)).

As noted above, the University maintains that Plaintiff was dismissed from the Program for multiple reasons; namely (1) his failure to obtain an advisor by the end of his first year in the Program, and (2) because failing to obtain an advisor would have

---

suit under Title VII requires a claimant to exhaust his administrative remedies.  *Weigel v. Baptist Hosp. Life. Tenn.,* 302 F.3d 367, 379 (6th Cir. 2002).  An individual satisfies his duty to exhaust administrative remedies by timely filing a charge with the EEOC and receiving notice of a right to sue. *Pucket v. Tennessee Eastman Co.*, 889 F.2d 1481, 1486 (6th Cit. 1989).  Failure to pursue the administrative remedies required by the EEOC regulations bars judicial relief. *Benford v. Frank*, 943 F.2d 609, 612 (6th Cir. 1991).

resulted in a second consecutive quarter of academic probation since he was already on academic probation for having received a grade below "B" in Cell Biology. *Id.* The University further identified several additional non-academic "red flags" relating to Plaintiff's behavior. Notably, Plaintiff violated the protocol set forth for challenging his Cell Biology grade and a lab grade. (Czyzyk-Krzeska Dep. 77-85; Plaintiff Dep. Ex. 10). He chose to contact professors directly, thus destroying any anonymity with respect to his grade, even though it is undisputed that he knew he was not supposed to do so. (Doc. 64, Exs. 12, 14, 16). In addition, Dr. Czyzyk-Kreska testified at her deposition that there was one instance when Plaintiff came to her office and threatened to file a grievance unless he was maintained in the Graduate Program. (Czyzyk-Kreska Dep. 73-74). Czyzyk-Kreska perceived Plaintiff's actions as a "sort of blackmailing, threatening statement . . . psychological threat." *Id.*

In any event, Plaintiff argues that there are four comparable students who were treated more favorably: Monica Summe, Andrew Pulach, Joe Vasiliaskus, and Meghan Rojas. Applying the standards set forth in *Mitchell, Ercegovich, and Pierce*, the University asserts, however, that Plaintiff cannot establish that he was similarly situated to those students. The University contends that the four students identified by Plaintiff did not deal with the same supervisor as Plaintiff and/or did not engage in the same conduct as Plaintiff. As such, they are not similarly situated to Plaintiff for purposes of a Title VII disparate treatment analysis.[3] The undersigned agrees.

---

[3] Moreover, each of the individuals Plaintiff listed were graduate students in the University's Department of Cancer and Cell Biology but Plaintiff has failed to produce evidence showing that those individuals were also University "employees" (as is assumed for purposes of this section) in the Title VII context. Without more, the graduate students Plaintiff points to as comparable are per se dissimilar in that highly relevant respect. Even if the individuals Plaintiff points to as comparable are also considered University employees, as set forth below, the individuals are not otherwise similarly situated to Plaintiff.

Plaintiff asserts that Monica Summe, a Caucasian female born in the United States, was not placed on probation and/or terminated from the program after receiving four "C's in two years.  In contrast, Plaintiff notes that he was terminated from the program within one year for one C grade.  Such alleged similarities, however, fail to establish that Ms. Summe and Plaintiff were comparable for purposes of establishing a *prima facie case* of discrimination.

Summe enrolled in the Program from July 2007 through June 2009.  (Doc. 74, Pl's Ex. 22.).  When Summe entered the Program, the Program was under different leadership than during Plaintiff's term.  Professor Robert Brackenbury was the Director of the Program and Professor Peter Stambrook was the Chair.  (Doc. 64, Ex. 5; Brackenbury Dep. 34-36, 41).  Professors Stambrook's and Brackenbury's shared approach was that a student receiving a "C" grade the first time he or she took a core course (such as Biochemistry or Cell Biology) did not necessarily warrant, in and of itself, placement on academic probation.  (Brackenbury Dep. 28-31; Stambrook Dep. 28-29).  Instead, Professors Brackenbury and Stambrook based placement on academic probation on a student's overall grade point average in their didactic courses. (Brackenbury Dep. 34-36; Stambrook Dep. 17).  Students who did not maintain at least a 3.0 GPA in their didactic courses were placed on academic probation the following quarter.  *Id.*  Although Professors Brackenbury and Stambrook would not necessarily place a student on academic probation for a grade of "C" in core courses, students receiving such grades were informed that for satisfactory progress in the Program they had to receive a grade of "B" or better in these courses by the end of their second year in the Program.  *Id.*

In August 2008, shortly after Plaintiff's acceptance into the Department of Cancer and Cell Biology, that Department merged with the Department of Molecular Oncology. (Stambrook Dep. 34; Czyzyk-Krzeska Dep. 45).  After the merger, Jorge Moscat, who was chair of the Department of Molecular Oncology, replaced Stambrook as the chair of the newly constituted Department of Cancer and Cell Biology.  (Stambrook Dep. 10; Czyzyk-Krzeska Dep. 46).  Shortly before the merger, on July 21, 2008, Brackenbury sent out an email announcing that he had resigned from his position as Director of the Program.  (Brackenbury Dep. 19, 22; Doc. 74, Ex. 4).  After Brackenbury's resignation, Moscat appointed Susan Waltz and Maria Czyzyk-Krzeska as co-directors of the Program.  (Waltz Dep. 37; Czyzyk-Krzeska Dep. 50).

In July 2008, Professor Brackenbury resigned from his position, Dr. Parysek's position was eliminated and a new Graduate Committee was formed headed by new Program Co-Chairs Drs. Susan Waltz and Maria Czyzyk-Krzeska.  Because of the transition between the two administrations, Ms. Summe's grades were not immediately audited (she received a C in a course in the fall of 2008, which was posted in late December 2008).  Thereafter, in February 2009, Ms. Summe notified the graduate committee that she no longer intended to seek a Ph.D., but instead wished to obtain a Master's in Science Degree.  Her request was approved, but she was ultimately terminated from the program for failing to take any steps to achieve her Master's Degree.

Ms. Summe, unlike Plaintiff, did not have trouble obtaining an advisor and did not remain in the Program's Ph.D track after her first year.  Furthermore, there is no evidence that she improperly contacted professors (in violation of Program Regulations)

-24-

attempting to get her grades changed or otherwise engaged in inappropriate behavior. In addition, as noted by the University, the Graduate Program leadership team and Graduate Committee structure changed between Ms. Summe and Plaintiff's tenures.

Plaintiff next identifies Andrew Paluch as a comparable that was treated more favorably. Plaintiff asserts that Mr. Paluch was allowed to select an advisor who held no funding and was on a probationary appointment. Paluch enrolled in the Program in July 2008. (Doc. 74, Pl's Ex. 22). Paluch's first advisor was Dr. Angela Drew, with whom Paluch began working during rus first year in the Program. (Waltz Dep. 65). During Pulach's second year in the Program, the University decided not to reappoint Dr. Drew to her faculty position. *Id.* at 66-67. As a result, Paluch needed to find a new advisor. He rotated with Dr. Maria Diaz-Meco and then formally joined the lab of Dr. Diaz-Meco. *Id.* Dr. Diaz-Meco decided to leave the University, causing Paluch to find another advisor. Paluch then started a rotation in the lab of Dr. Susan Waltz and soon she became his advisor. *Id.* Thus, Paluch, unlike Plaintiff, did not fail to obtain an advisor before the end of his first year in the Program. Additionally, as in the case of Ms. Summe, there is no evidence that Mr. Paluch improperly contacted professors (in violation of Program Regulations) attempting to get his grades changed or otherwise engaged in inappropriate behavior.

Plaintiff further asserts that Joe Vasiliauskas, a Caucasian, born in Lithuania, is also similarly situated. (Doc. 74, Pl's Ex. 22). Vasiliauskas enrolled in the Program in July 2008. *Id.* Vasiliauskas's original advisor was Dr. Jinsong Zhang. (Waltz Dep. 65, 67). Vasiliauskas rotated in Dr. Zhang's lab and joined Dr. Zhang's lab during his first year in the Program. *Id.* During his second year in the Program, Vasiliauskas decided

to leave Dr. Zhang's lab for personal reasons. Prior to leaving Dr. Zhang's lab, Vasiliauskas arranged a rotation with Dr. Susan Waltz. *Id.* Again, unlike Plaintiff, Vasiliauskas did not fail to obtain an advisor before the end of his first year in the Program. Additionally, as in the case of Ms. Summe, there is no evidence that Vasiliauskas improperly contacted professors (in violation of Program Regulations) attempting to get his grades changed or otherwise engaged in inappropriate behavior.

Last, Plaintiff contends that he is similarly situated with Meghan Rojas, a Caucasian female. The record indicates that Rojas joined the Cancer and Cell Biology Graduate Program in 2006. (Waltz Dep. 130-134). After rotating, she joined Dr. Lee Grimes's lab prior to the end of her first year in the Program. (Id.) In December 2009, nearly three years after starting in the Program, Dr. Grimes terminated Rojas's membership in his lab. (Czyzyk-Krzeska Dep. 130). On January 11, 2010, the University sent Rojas a letter in which she was given until March 2010 to find a new advisor and laboratory. She was also told that if she did not obtain an advisor by that time the Graduate Committee would have to review her case again. (Doc. 74, Pl's Ex. 39). Rojas timely found a replacement lab and advisor. (Waltz Dep. 130-134). Again, unlike Plaintiff, Rojas did not fail to obtain an advisor before the end of her first year in the Program. Additionally, as in the case of Ms. Summe, there is no evidence that Rojas improperly contacted professors (in violation of Program Regulations) attempting to get her grades changed or otherwise engaged in inappropriate behavior.

Here, the evidence establishes that Plaintiff and Summe, Karch, Paluch, Vasiliauskas, and Rojas were not similarly situated in all relevant aspects, as they did not fail to secure an advisor during their *first year* in the program and did not engage in

the same "red flag" behavior as noted above.  Such mitigating circumstances justify the University's individual treatment of Plaintiff.  *See Morris v. Family Dollar Stores of Ohio, Inc.* 320 Fed. Appx. 330 (6th Cir. 2009) (where an employee alleges discriminatory disciplinary action the individuals with whom the plaintiff seeks to compare his/her treatment must ... have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it)(citations and quotations omitted).

In light of the foregoing, the undersigned finds that Plaintiff has failed to establish that he was treated less favorably than similarly-situated individuals outside the protected class.

D.  *The University's non-discriminatory reason for Plaintiff's termination from the Program and Plaintiff's arguments regarding pretext*

Even if Plaintiff could establish a *prima facie* case of discrimination, the University has proven a legitimate, nondiscriminatory business purpose for its actions. The uncontested evidence shows that Plaintiff did not secure a thesis advisor by the end of his first year in the Program.  Plaintiff's failure to obtain an advisor would have resulted in a second consecutive quarter of academic probation since he was already on academic probation for having received a grade below "B" in Cell Biology.  *Id.*  Both of these reasons, individually and collectively, constitute grounds for dismissal.

In an effort to rebut the University's stated reasons for Plaintiff's termination, Plaintiff asserts that his performance can be easily measured by published standards and that his termination was based on "rules that don't exist."  (Doc. 75, p. 73).  Notably, Plaintiff asserts that not selecting an advisor is not grounds for dismissal from the

Program.  Finally, Plaintiff contends that the University was determined to dismiss him, regardless of the reasons.

Such assertions, however, fail to establish that the stated reasons for Plaintiff's dismissal from the program had no basis in fact; did not actually motivate the University's decision; or were insufficient to warrant the decision.  *See Manzer,* 29 F.3d at 1084.

As noted by the University, the Graduate Program's Graduate Committee, made a purely academic decision in dismissing him from the Graduate Program; an academic predicament entirely of Plaintiff's own making.  The University's decision requires deference especially considering that Plaintiff has failed to show through direct or circumstantial evidence that the University harbored any discriminatory intent in making its decision. *Regents of University of Michigan v. Ewing*, 474 U.S. 214, 225 (U.S. 1985); *Board of Curators, Univ. of Mo. v. Horowitz*, 435 U.S. 78, 96, n. 6 (1978) (Powell, J., concurring). ("University faculties must have the widest range of discretion in making judgments as to the academic performance of students and their entitlement to promotion or graduation."); *Bucklen v. Rensselaer Polytechnic Inst.,* 166 F. Supp. 2d 721, 2001 U.S. Dist. LEXIS 12686, *12 (N.D.N.Y. 2001) ("Court...cannot extend the parameters of Title VII to encompass purely academic decisions...").

In light of the foregoing, Plaintiff has failed to rebut the University's legitimate non-discriminatory reasons for his termination and has failed to produce any evidence that the University intended to discriminate against Plaintiff on the basis of race or national origin.  *See Thurman*, 90 F.3d at 1166 (citing *Hicks*, 509 U.S. at 502) ("The ultimate burden of persuasion remains with the plaintiff to prove that the employer's

reasons were a pretext for discrimination and that the employer intended to discriminate on the basis of race").  Although the summary judgment standard requires that evidence of record be viewed in the light most favorable to the nonmoving party, it does not require that all bald assertions, opinions, or even genuinely held beliefs asserted by the nonmoving party be adopted wholeheartedly by a court. *Diaz v. Mitchell's Salon and Day Spa, Inc.*, Case No. 1:09-cv-882, 2011 WL 379097, * 7 (S.D. Ohio 2011) (J. Weber).  Plaintiff's unsupported conclusions are insufficient to meet his burden of establishing that the University's proffered reasons for his dismissal from the graduate program were a pretext for racial discrimination.

### III. Conclusion

For these reasons, **IT IS THEREFORE RECOMMENDED THAT** the University's motion for summary judgment (Doc. 65) be **GRANTED** and this case be **TERMINATED** on the active docket of the Court.

<u>*s/ Stephanie K. Bowman*</u>
Stephanie K. Bowman
United States Magistrate Judge

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

ALI AL-MAQABLH,

       Plaintiff,                       Case No. 1:11-cv-531

     vs.                             BECKWITH, J.
                                    BOWMAN, M.J.

UNIVERSITY OF CINCINNATI
COLLEGE OF MEDICINE, et al.,

       Defendants.


**NOTICE**

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to this Report and Recommendation ("R&R") within **FOURTEEN (14) DAYS** of the filing date of this R&R.  That period may be extended further by the Court on timely motion by either side for an extension of time.  All objections shall specify the portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections.  A party shall respond to an opponent's objections within **FOURTEEN (14) DAYS** after being served with a copy of those objections.  Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).